IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 22, 2005 Session

## PATTI  ZAKOUR v. UT MEDICAL GROUP, INC., ET AL.

**A Direct Appeal from the Circuit Court for Tipton County**
**Nos. 5234, 5500     The Honorable Joseph H. Walker, Judge**

_____

**No. W2003-01193-COA-R3-CV - Filed October 31, 2005**

_____

The jury returned a verdict for the defendant doctors and medical clinic in this medical malpractice action.  The plaintiff argues on appeal that the trial court committed reversible error at several stages of the trial, including jury selection, witness' testimony and jury instructions.  Further, the plaintiff argues that there was insufficient evidence to support the jury's verdict.  We affirm the trial court.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

Daniel A. Seward of Memphis, Tennessee for Appellant, Patti Zakour

John H. Dotson of Memphis, Tennessee for Appellees, UT Medical Group, Inc. and Scott Craig, M.D.

**OPINION**

On June 2, 1998, Patti Zakour[1] ("Plaintiff" or "Appellant") presented to the Family Practice Center  ("the clinic") in Covington, Tennessee operated by the University of Tennessee Medical Group ("UTMG").  Ms. Zakour presented with a mass in her right breast estimated by her examining physician, resident Dr. Nancy Rockstroh, to be 1.5 centimeters in diameter.  Dr. Rockstroh consulted with Dr. John Kelly, another physician at the clinic, and they agreed to refer patient for a

---

[1]  While the case was on appeal, the Appellees filed a Suggestion of Death of Plaintiff/Appellant, and pursuant to the Order of this Court, Appellant's counsel has filed a motion for substitution of parties, citing that the decedent was unmarried at the time of her death, that no estate has been opened for the decedent, and that she was survived by four children, Jacob Shores, Eric Nelson, Leif Nelson, and Misty Nelson, who are the proper parties for substitution, pursuant to T.C.A. § 20-5-106.

mammogram. The mammogram was performed on June 4, 1998 at the Baptist Hospital in Tipton County. The mass was interpreted by Dr. Soheil Hanna, the examining radiologist, as "probably benign." On June 5, 1998, Dr. Kelly sent a letter to Ms. Zakour stating that, based on the radiologist's reading of the mammogram, he recommended a follow-up mammogram in six months. Ms. Zakour returned to the clinic on July 6, 1998, where Dr. Rockstroh, and her supervising physician, Dr. Scott Craig examined her. According to the medical records, Dr. Rockstroh, with Dr. Craig's consent, recommended a repeat clinical breast exam in three months and a repeat mammogram in six months. The doctors allege that they told Ms. Zakour that she had two options, to either pursue a surgical referral for biopsy of the mass or choose a close clinical follow-up. The doctors stated that Ms. Zakour chose the close clinical follow-up. Ms. Zakour was told by the doctors to return to the clinic in three months. In March of 1999, nine months after the original mammogram, Ms. Zakour returned to the clinic complaining that the mass had become larger. Based on the changed condition of Ms. Zakour's right breast, Drs. Rockstroh and Craig referred Ms. Zakour for a surgical consult. Following a biopsy, Ms. Zakour was diagnosed with metastatic breast cancer.

On March 8, 2000, Ms. Zakour filed suit against Dr. Nancy Rockstroh, Dr. Scott Craig, Dr. John Kelly, UT Medical Group, Inc. a/k/a Family Practice Center, Baptist Memorial Hospital-Covington, and Dr. Soheil Hanna. The Complaint alleged that the defendant Drs. Craig and Rockstroh negligently failed to diagnose Ms. Zakour's cancer and that as a proximate result of such negligence, Ms. Zakour suffered injuries, which would not otherwise have occurred. On April 20, 2000, Dr. Craig and UTMG filed separate answers to the complaint. On November 15, 2000, the court entered an order of Voluntary Dismissal as to Dr. Craig. Ms. Zakour refiled her Complaint against Dr. Craig on November 15, 2001. On May 17, 2002, a consent order was entered consolidating the case against UTMG with the new case against Dr. Craig. Because of the various nonsuits and amendments, the pleadings in this case are somewhat confusing. However, we see no need to relate the pleadings in detail, but suffice it to say that at the time of trial, only defendants Dr. Craig and UTMG ("Defendants") remained in the lawsuit.

The trial began on March 31, 2003. During jury selection, Plaintiff Zakour's counsel objected to the peremptory challenges by Defendants, charging that the defense counsel was striking jurors based on race and gender. Plaintiff issued a *Batson* Challenge and argued that the Defendants gave no neutral reason or legal justification for challenging all the African-American members of the jury pool. Further, Plaintiff argued that the Defendants' exclusion of women from the jury pool was prejudicial. The trial court denied the Plaintiff's objections as to peremptory challenges of the Defendants. The Plaintiff then moved for a mistrial, which the trial court denied. The resulting jury consisted of four females, and eight males, all of whom were Caucasians.

During the trial, Defendants called Alisa Goehring, UTMG Manager of Contract and Legal Services as the corporation's representative and as a witness. Ms. Goehring was disclosed by way of amended interrogatory responses on the first morning of the trial, two days before she was to testify. Plaintiff objected to Ms. Goehring being called as a witness, claiming that she had not been properly identified during discovery. Plaintiff made an oral motion to prevent Goehring from testifying, or in the alternative to be able to depose her prior to testimony, but plaintiff's attorney was

specifically authorized to talk with Ms. Goehring before she testified. The Plaintiff's motion was denied. Ms. Goehring testified that the Defendant UTMG was a nonprofit organization whose purpose was patient care, research and the training of doctors. Ms. Goehring testified that at the time Ms. Zakour was treated at the UT Family Practice Center in Covington, Tennessee, UTMG operated that clinic. Upon cross examination of Goehring, Plaintiff attempted to examine the witness about UTMG physician profit-sharing plans and revenue generated by UTMG and its employee physicians. Upon objection of Defendants' counsel, the trial court would not allow Plaintiff to cross examine Ms. Goehring regarding the financial structure of UTMG, and the compensation of its physicians. Plaintiff made an offer of proof regarding the compensation plan of UTMG based upon production and percentage of revenue brought in by physicians.

At the conclusion of proof, Plaintiff objected to the jury instruction proposed by the Defendants' counsel referring to Tennessee Pattern Jury Instruction 6.11, Duty of Specialist. Plaintiff argued that Dr. Craig was not a specialist at the time he treated Ms. Zakour, because he did not take the exam to become board certified in family medicine until the month after he treated the Plaintiff in July of 1998. The trial court overruled this objection, and gave the instruction to the jury. Further, the Plaintiff objected to the trial court's placing of non defendants Drs. Kelly and Rockstroh on the jury verdict form, and not putting Defendant UTMG on the jury verdict form. The trial court overruled the Plaintiff's objection as to named parties on the jury verdict form. The verdict form, as submitted to the jury, listed Drs. Craig, Kelly, Rockstroh, and Plaintiff Zakour, but did not list UTMG for assignment of fault. On April 2, 2003, the jury returned a verdict in favor of Defendants, finding that none of the physicians were negligent, and a judgment was entered thereon. On May 1, 2003, the Plaintiff filed a motion for a new trial, which was denied by the trial court on October 7, 2003. Plaintiff filed a Notice of Appeal and raises the following issues for review, as stated in her brief:

> 1. Whether the Appellees issued peremptory challenges to potential African-American jurors based upon their race in an attempt to secure an all white jury in violation of the equal protection clause and Tennessee law?
>
> 2. Whether the Appellees issued peremptory challenges to potential female jurors based upon their gender in an attempt to secure a male dominated jury in violation of the equal protection clause and Tennessee law?
>
> 3. Whether it was reversible error to allow the [Appellees'] witness, Alisa [Goehring], to testify on appellees' behalf when she had not been identified as a witness prior to trial and whether the trial court properly limited the cross examination of Appellant's counsel regarding her testimony?
>
> 4. Whether the trial court committed error in not putting UT Medical Group, Inc. on the jury verdict form and was there also error in the

trial court placing non defendants, Drs. John Kelly and Nancy Rockstroh, on the jury verdict form?

5. Whether it was reversible error for the trial court to instruct the jury on T.P.I. 6.11, Duty of Specialist, when the [Appellee] was not a specialist of any kind at the time of the alleged negligent acts?

6. Whether the testimony of Appellees' expert, Dr. Birkenstock, properly rebutted or refuted the Appellant's experts, Dr. Johnson and Dr. Shull and whether Appellees' expert presented credible evidence on the standard of care in this case.

This medical malpractice action is controlled by T.C.A. § 29-26-115 (2005 Supp.), which provides in pertinent part:

> **29-26-115. Claimant's burden in malpractice action – Expert testimony – Presumption of negligence – Jury instructions. –** (a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Where, as here, a trial judge has approved a jury's verdict, our standard of review is whether there is any material evidence to support the jury's verdict. Tenn. R.App. P. 13(d). Absent a reversible error of law, we will set aside a judgment on a jury verdict only where the record contains no material evidence to support the verdict. *Foster v. Bue,* 749 S.W.2d 736, 741 (Tenn. 1988). However, issues that hinge on the proper interpretation of law and its application to the facts of this case are questions of law. *Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc.,* 87 S.W.3d 67, 74 (Tenn. 2002); *Waller v. Bryan,* 16 S.W.3d 770, 773 (Tenn. Ct. App. 1999). The trial court's resolution of a question of law is not entitled to Tenn. R.App. P. 13(d)'s presumption of correctness on appeal; instead, this Court reviews *de novo* issues regarding a trial court's proper application of the law. The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, the jury in this cause, and the credibility accorded will be given great weight by the appellate court. *Kim v. Boucher*, 55 S.W.3d 551 (Tenn. Ct. App. 2001).

We will now consider the issues.

-4-

1. Whether the Appellees issued peremptory challenges to potential African-American jurors based upon their race in an attempt to secure an all white jury in violation of the equal protection clause and Tennessee law?

Relying on **Batson v. Kentucky,** 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), Appellant argues that the exclusion of the only African-American members of the venire from the jury violated her constitutional right to equal protection under the law. This issue requires us to determine whether the trial court failed to follow the three-step process of *Batson*, when it denied the Appellant's objection of the use of Defendant's peremptory challenges for all the African-American members of the jury pool. We review for clear error a trial court's decision on the ultimate question of discriminatory intent under *Batso*n. **Hernandez v. New York,** 500 U.S. 352, 364, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). We may reverse that finding of fact only where we find clear error. **Id.** at 369, 111 S.Ct. 1859. **See also Woodson v. Porter Brown Limestone Co., Inc.,** 916 S.W.2d 896, 906 (Tenn. 1996); **State v. Carroll,** 34 S.W.3d 317, 319-20 (Tenn. Crim. App. 2000).

In Tennessee, the right to exercise a peremptory challenge is provided by statute. According to T.C.A. § 22-3-105 (1994), "either party to a civil action may challenge four (4) jurors without assigning any cause." T.C.A. § 22-3-105 (a). As in the present case, if there is "more than one party defendant in a civil action, four (4) additional challenges shall be allowed." T.C.A. § 22-3-105 (b). The trial court followed the statute, which entitled Plaintiff to four peremptory challenges and entitled the Defendants to eight.

The record establishes that at the beginning of voir dire, two prospective jurors were excused because they could not serve for the full extent of the trial. Five other prospective jurors were excused for cause because, either they or their family members, were patients of the Defendant, Dr. Craig. On the first round of challenges, five prospective jurors were challenged, four females and one male, at least one of the females being an African-American.[2] The second round of peremptory challenges included two prospective jurors, one male and one African-American female. Plaintiff's counsel issued a *Batson* challenge, objecting to the Defendants' peremptory challenges as impermissibly based on race, citing the exclusion by the defense of the only two African-Americans of the venire. The court did not address the Plaintiff's *Batson* challenge at that time. Following the third round of challenges, and after the Defendants' exclusion of a third and the only remaining African-American from the venire, the Plaintiff requested that the court address her *Batson* challenge. At the bench, the Plaintiff asked that the Defendants state a race-neutral basis for their

---

[2] It is not discernable from the record precisely which prospective jurors were African-American. However, the record allows the court to determine that the Defendants used seven peremptory challenges in the following manner: Gender: six females, one male; Race: three African-Americans, four European-Americans. The Plaintiff used four peremptory challenges, all four European-American males.

exclusion of all the African-American members of the venire. The following exchange took place at the bench in the presence of the jury, but outside the hearing of the jury:

> **Defense Counsel:** As far as Ms. Frazier was concerned, I believe she was the one that had the difficulty remembering about what kind of – what she decided on a previous jury case in a civil action. That causes me some concern, plus the fact that she had some family history with cancer.

> *     *     *

> As far as Ms. Sneed, Your Honor, she was one of the people that I noticed was nodding her head all throughout the portion of Mr. Seward's (Plaintiff's counsel) examination. I've got other people like Ms. McIntosh nodding head. Ms. Craig, also Ms. Bryant nodding head. Your Honor, that's the reason why.[3]

> **Plaintiff's Counsel:** I would say out of the three African-American females that have been seated on this jury, this defendant has systematically excluded African-American females from the jury pool of a jury pool that consisted of a maximum of 11 African-Americans to begin with. He systematically excluded or struck each African-American in the jury, or potential jurors, with no race-neutral basis, and it's basically nothing more than an attempt to select an all-white jury to try this case.

> **Defense Counsel:** First of all, Your Honor, I take personal offense about the allegation of systematic elimination of African-Americans. I've never been accused of that ever before in my professional career. But to get to the meat of the matter, I've had justification for each and every one of my strikes.

> If Your Honor, in order to clear the record, wants us to withdraw our objection as to Ms. Sneed, I'm happy to do that since that's primarily based on the head nodding, which I have, just frankly, struck everybody that did that.

> **The Court:** The court will accept that as a race-neutral reason. If you still want to use that strike, you can.

> **Defense Counsel:** My co-counsel says stay with it.

---

[3] From the record, it appears that Ms. Frazier and Ms. Sneed are African-Americans. It is unclear whether the remaining African-American in the jury pool was Ms. McIntosh, Ms. Craig, or Ms. Bryant.

> **Plaintiff's Counsel:** Your Honor, I respectfully object just for the
> record, at this point and ask the Court to note my exception to the
> ruling, respectfully.

In *Batson,* the United States Supreme Court made it clear that a peremptory challenge to strike a juror may not be exercised on the basis of race. *Batson,* 476 U.S. at 89, 96-98. The procedure for invoking a *Batson* challenge was discussed in *State v. Carroll,* 34 S.W.3d 317 (Tenn. Crim. App. 2000) as follows:

> *Batson* provides a three-step process for the evaluation of racial discrimination claims in jury selection. First the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. *Puckett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 1770-71, 131 L.Ed.2d 834 (1995); *Batson,* 476 U.S. at 96-98, 106 S.Ct. 1712, 1722-24. If the defendant satisfies this initial burden, the burden then shifts to the prosecutor to articulate a race-neutral explanation for excluding the venire member in question. *Puckett,* 514 U.S. at 767, 115 S.Ct. 1770-71; *Batson,* 476 U.S. at 94, 106 S.Ct. 1712, 1721. Third, the trial court must determine whether the defendant has met his burden of proving purposeful discrimination. *Batson,* 476 U.S. at 97-98, 106 S.Ct. 1712, 1723-24; *Hernandez v. New York,* 500 U.S. 352, 358-59, 111 S.Ct. 1859, 1865-66, 114 L.Ed.2d 395 (1991). In making its determination of whether use of a peremptory challenge was discriminatory, the trial court must articulate specific reasons for each of its findings. *Woodson* [*v. Porter Brown Limestone Co.*]*,* 916 S.W.2d [896,] 906 [Tenn.1996]. The trial court's findings are imperative for rarely will a trial record alone provide a legitimate basis from which to substitute an appellate court's opinion for that of the trial court. Thus, on appeal, the trial court's finding that the State excused a venire member for race-neutral reasons will not be reversed unless it is clearly erroneous. *See Woodson,* 916 S.W.2d at 906.

*Carroll,* 34 S.W.3d at 319-20. As in *Carroll,* the trial court in the present case did not make a specific finding that Plaintiff had made a *prima facie* showing of discrimination. *See id.* at 392. Nonetheless, the trial court would not have required the Defendant to provide a race-neutral explanation for the challenge had the trial court determined that a *prima facie* showing had not been made. *Id.; see also Woodson,* 916 S.W.2d at 905. "Thus, we assume that the court implicitly found that [Defendant] had satisfied the first prong of the *Batson* test." *Carroll,* 34 S.W.3d at 320. As the United States Supreme Court observed in *Hernandez,* "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges [without prompting] and the trial court has ruled on the

ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot." ***Hernandez,*** 500 U.S. at 359, 111 S.Ct. at 1866.

The trial court's findings are sparse regarding the Defendants' race-neutral explanation for the challenge. The record is sufficient, however, to undertake our review. The issue in the second step of the *Batson* process rests upon the facial validity of the Defendants' explanation." ***Id.*** at 360, 111 S.Ct. at 1866. "A neutral explanation . . . means an explanation based on something other than the race of the juror." ***Id.*** Unless a discriminatory intent is inherent in the Defendants' explanation, "the reason offered will be deemed race-neutral." ***Id.*** In the second phase of the inquiry, the Defendants' explanation is not required to be "persuasive or even plausible." ***Puckett,*** 514 U.S. at 768, 115 S.Ct. at 1771.

In the present case, the Defendants offered several explanations for their challenges. First, the Defendants stated that Ms. Frazier's had difficulty remembering what she decided on a previous jury case in a civil action, and that she had some family history with cancer. As to the other two African-Americans excluded by the Defendants, Ms. Sneed and another party, the Defendants challenged them because they were nodding their heads "all throughout the portion of [Plaintiff's counsel] examination." Defendants' counsel stated that he had excluded other individuals who are not African-Americans, for the same "head nodding" reason.

"The central function of the right of peremptory challenge is to enable a litigant to remove a certain number of potential jurors who are not challengeable for cause, but in whom the litigant perceives bias or hostility." ***State v. Spratt,*** 31 S.W.3d 587, 598 (Tenn. Crim. App. 2000). The determination of a discriminatory intent on the part of the challenger "largely will turn on evaluation of credibility." ***Baston,*** 476 U.S. at 98 n.21, 106 S.Ct. at 1724 n.21. "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." ***Hernandez,*** 500 U.S. at 365, 111 S.Ct. at 1869. The Defendants observed the three prospective jurors expressing a bias toward Defendants, and the trial court accepted this racial-neutral reason for exercising a peremptory challenge. Plaintiff has not shown that the trial court erred in accrediting the Defendants' racially neutral explanation for excusing the prospective witnesses. The Defendants' basis for the use of a peremptory challenge against the three African-Americans from the jury pool was sufficiently race-neutral to withstand a *Batson* challenge. Accordingly, we hold that the trial court correctly applied *Batson* in ruling there had not been a violation, and Plaintiff is not entitled to relief on this issue.

> 2. Whether the Appellees issued peremptory challenges to potential female jurors based upon their gender in an attempt to secure a male dominated jury in violation of the equal protection clause and Tennessee law?

Following the court's resolution of the Plaintiff's *Batson* challenges based on race, and after the fourth round of peremptory challenges was complete, the Plaintiff made a second Batson challenge based on the Defendants' use of six of their seven peremptory challenges to exclude females from the jury pool. During a bench conference, which was held on the record in the presence of the jury but out of the hearing of the jury, the following exchange took place:

> **Plaintiff's Counsel:** Your Honor, at this point I would renew my motion as to my previous *Batson* challenge as to the voir dire of this jury selection process by the defendant. I would say to the Court . . . of the seven [challenges used by Defendant] either all but one were females that they challenged during the peremptory challenges, and I would say on that basis there has been as a result a process of eliminating females from the jury systematically by the defendants in this case. Not necessarily African[-American] females. In retrospect, all females. So I would say the record speaks for itself. I would state to the Court out of the, I believe the number is seven that were challenged. I believe the only male they informed me of was Mr. Smith, who was a male.
>
> *           *           *
>
> **The Court:** I guess for the record I should say that there are currently four females and seven males empaneled. Does the defendant have any response?
>
> **Defendants' Counsel:** Well, I'm glad, Your Honor, that the *Batson* challenge has been I guess removed as far as race, and we did strike at least one male that I have notes on. We certainly were not – that wasn't the determining factor. If the Court wants me to go back through each and every challenge, I think I can refer to my notes and come up with that. But we do have four female jurors on this jury.
>
> And we went through the same process Mr. Seward [Plaintiff's counsel] did. And I don't go back and take a look at his challenges, if they were all men or not. But we had a fair representation of the community here, and there was no systematic for race or sex factor, just all based on experience and body mechanics.
>
> **The Court:** I guess for the record the plaintiff exercised all four challenges, and they were all male.
>
> **Plaintiff's Counsel:** Thank you, Your Honor.
>
> **The Court:** Okay. Is there anything else?
>
> **Plaintiff's Counsel:** No, Your Honor.

In ***J.E.B. v. Alabama, ex rel. T. B.,*** 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the United States Supreme Court held that peremptory strikes made solely on the basis of gender also violate the dictates of the equal protection clause. The Supreme Court of Tennessee has addressed this issue in holding that a defendant could not use peremptory strikes to remove all females from the jury venire. ***State v. Turner,*** 879 S.W.2d 819, 823 (Tenn.1994). The procedure and burdens for invoking the protection of *Batson* based on gender are the same as a challenge based on race. ***State v. Spratt,*** 31 S.W.3d 587, 596 (Tenn. Crim. App. 2000).

In this case, Plaintiff's objection to the state's use of six out of seven of its peremptory challenges to remove women from the jury pool sufficed to raise an inference that the gender of the jurors involved was a factor in the decision to strike. That inference established, we turn to the explanation given by the Defendants for its challenged strikes. The Defendants explained that their challenges were based on body mechanics of the prospective jurors and their own past experiences. Additionally, the Defendants pointed out that one of their challenged jurors was a male. Again, the trial court's findings are sparse regarding the State's gender-neutral explanation for the challenge. However, the Court obviously accepted this explanation as gender-neutral and stated for the record that the plaintiff exercised all four of her challenges on males.

In *J.E.B.*, the U.S. Supreme Court states that "when an explanation is required, it need not rise to the level of a "for cause" challenge; rather, it merely must be based on a juror characteristic other than gender, and the proffered explanation may not be pretextual. ***J.E.B.,*** 511 U.S. at 144. Furthermore, "[w]hat *Batson* means by a legitimate reason is not a reason that makes sense, but a reason that does not deny equal protection." ***Purkett v. Elem.*** 514 U.S. at 767. With these considerations, we conclude that the basis for the Defendants' use of peremptory challenges against six female jurors was sufficiently gender-neutral to dispel any indicia of purposeful discrimination. Accordingly, we hold that the trial court correctly applied *Batso*n in ruling there had not been a violation, and Plaintiff is not entitled to relief on this issue.

> 3. Whether it was reversible error to allow the [Appellees'] witness, Alisa [Goehring], to testify on appellees' behalf when she had not been identified as a witness prior to trial and whether the trial court properly limited the cross examination of Appellant's counsel regarding her testimony?

The record shows that the Plaintiff served the Defendants with interrogatories and request for production of documents on December 13, 2002. The Plaintiff's interrogatory question number one submitted to the Defendants was:

1. State the name, address and telephone number of each and every person who has any knowledge of the allegations and/or circumstances relevant to the claim of Patti Zakour in this lawsuit, not only of the events of the occurrence itself, but also the events immediately preceding and subsequent thereto.

The Defendants submitted responses to the Plaintiff's first set of interrogatories,[4] and included in its answer to question number one a UTMG representative. However, the Defendants did not list by name a specific UTMG representative. The Defendants amended their responses on March 31, 2003, the first day of the trial, to include the name of Alisa Goehring as the name of the UTMG representative. Tennessee Rule of Civil Procedure 26.05 (1)(A) requires that a party is under a duty to supplement a response to a request for discovery under limited circumstances. The Rule reads, in pertinent part:

A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information thereafter acquired, except as follows: (1) A party is under a duty seasonably to supplement the party's response with respect to any question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters . . .

T.R.C.P. 26.05 (1)(A). Thus, the Defendants were obligated under the rules to amend their interrogatory responses to include Alisa Goehring because the Defendants intended to call her to testify as to matters regarding the employment status of the defendant physicians. Prior to Ms. Goehring's testimony, Plaintiff's counsel made an oral motion to exclude her testimony. The following proceedings were had out of the presence of the jury:

**Plaintiff's Counsel:** I'm going to make an oral motion at this time to exclude the testimony of Ms. Goehring. She wasn't disclosed to me . . . her individually, specifically, until Monday morning; is that correct?

**Defendant's Counsel:** Her name. Before that we had told you that the parties - - you asked for people with knowledge, and we said the parties have knowledge. The understanding was that the party that was a UTMG representative would be coming to trial, and you never

_____

[4] It is not determinable from the record when the Defendants' initial response to the Plaintiff's first set of interrogatories was submitted.

asked for 30(b)(6).  That's all she is.  She has facts about UTMG as an institution.  And I did identify her to you Monday by name.

**Plaintiff's Counsel:** I agree, you did.  But in Interrogatory I asked to state the name, address, telephone number of each and every person who has knowledge of the circumstances relative to the claim of Patti Zakour in this lawsuit, not only the events of the occurrence itself, also of proceedings subsequent - -

**The Court:** We're going to take a break.  If you want to talk to her for a minute before she is called, I will allow that.

After further discussion, the Judge denied the Plaintiff's motion to exclude Ms. Goehring as a witness.

In Tennessee admissibility of evidence is within the sound discretion of the trial judge. When arriving at a determination to admit or exclude even that evidence which is considered relevant trial courts are generally accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of abuse of discretion. *See Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 442 -443 (Tenn.,1992); *Davis v. Hall,* 920 S.W.2d 213, 217 (Tenn. Ct. App. 1995).  While we will set aside a discretionary decision if it does not rest on an adequate evidentiary foundation or if it is contrary to the governing law, we will not substitute our judgment for that of the trial court merely because we might have chosen another alternative.

The trial court found that the Defendants listed a representative of UTMG in their initial response to the Plaintiff's interrogatories, therefore providing the Plaintiff an opportunity to depose a UTMG corporate representative prior to trial.  As required under Rule 26.05, the Defendants amended their responses to include the name of the specific UTMG representative, two days prior to calling Ms. Goehring as a witness. The trial court gave the Plaintiff an opportunity to speak to Ms. Goehring prior to her taking the stand.  Based on these facts, we find that the trial court properly applied the legal principles in allowing the witness, Alisa Goehring, to testify.  Accordingly, we find no error by the trial court in allowing the testimony of Ms. Goehring.

Plaintiff next questions whether reversible error was committed when the trial court limited the cross examination of Ms. Goehring by the Plaintiff's counsel.  Plaintiff asserts that she should have been allowed to cross examine Ms. Goehring, the UTMG Manager of Contract and Legal Services, regarding the financial structure of UTMG, and the compensation of its physicians.  In a bench conference prior to Ms. Goehring's testimony, Plaintiff's counsel stated that if Ms. Goehring was allowed to testify that UTMG was a non-profit corporation and its mission was patient care, research and the training of doctors, the Plaintiff should be able to counter that testimony with information regarding the compensation of UTMG's physicians and the UTMG physician incentive programs. Plaintiff made an offer of proof in the form of an Advisory Opinion written by the PWBA Office of Regulation and Interpretations in reference to a proposed UTMG Key Employee Incentive

Plan. The offer of proof gave information about a proposed plan that UTMG considered establishing to motivate its physicians and to increase revenues and retention of physicians by UTMG. Plaintiff stated that if Ms. Goehring was allowed to testify as to the "good will" of the Defendant UTMG that she should be "entitled to show that there's more than research and training going on; there's profit involved." The trial court responded to Plaintiff's request as to the scope of Ms. Goehring's testimony and cross examination by stating:

> The Court would not consider it relevant . . . that is, the gross income of UT Medical Group. . . . I don't think that would be relevant for the issues that the jury has to decide.

> Even with a nonprofit company , one would expect that the doctors that participate there do draw a salary and do make money. The church I attend is very nonprofit, but we still pay the pastor, and I think the jurors are aware of that. In any event, none of this is relevant to the issues that the jury has to decide.

> Again, it's been alleged in [the] Complaint, admitted in [the] Answer, that the various doctors were employees of UT Medical Group, so there's really nothing with regard to the agency for the jury to decide.

Ms. Goehring testified and the court sustained the objections on both direct and cross examination when counsel asked questions referring to the compensation of UTMG physicians. The trial court was evenhanded in its rulings, prohibiting either party from addressing financial matters of UTMG or its physicians. As stated above, admissibility of evidence rests within the sound discretion of the trial court, and will not be disturbed on appeal in the absence of an abuse of that discretion. From our examination of this record, we find that the trial court had properly applied the legal principles in prohibiting Ms. Goehring from testifying to facts relating to the compensation of UTMG physicians or revenues of the corporation. Accordingly, we find that the trial court did not abuse its discretion in limiting the scope of cross examination of Ms. Goehring by Plaintiff's counsel.

> 4. Whether the trial court committed error in not putting UT Medical Group, Inc. on the jury verdict form and was there also error in the trial court placing non defendants, Drs. John Kelly and Nancy Rockstroh, on the jury verdict form?

The Plaintiff argues that the absence of the named party, UTMG, on the jury verdict form, and the inclusion of non defendants Dr. Rockstroh and Dr. Kelly, confused the jury resulting in reversible error on the part of the trial court. Prior to closing arguments, the following discussion was had between the parties' counsel and the Court, outside the presence of the jury, regarding the parties to be named on the jury verdict form:

**Plaintiff's Counsel:** Could I put UT Medical Group by each doctor's name? "UTMG, Inc., and Dr. Rockstroh; UTMG, Inc., and Dr. Craig"?

**The Court:** I don't think that would be a proper verdict.

**Plaintiff's Counsel:** The only fear that I had, Your Honor, was that the jury is going to see nothing but three doctor's names on there, and if they give a verdict, they're going to feel they're not giving anything against UTMG in final form.

**The Court:** That's not their concern.

**Plaintiff's Counsel:** Yes, sir. That was my concern.

**The Court:** I mean, it's not their concern as to who has to pay a judgment. I mean, that's like wanting, in a car wreck case, to have the insurance company listed on the verdict form, because that's who would pay the verdict in a car wreck case, and that's not the jury's concern. The jury's concern is to determine who is at fault, not who pays the judgment.

**Plaintiff's Counsel:** Yes, sir. I understand that. And I've heard statements that if there is a verdict against the three, it is also a judgment against UTMG, so I will sit down on that, Your Honor.

Furthermore, in the instructions given by the court to the jury prior to their deliberations, the court clarified the relationship between the Defendants for members of the jury. The instructions given by the court, in pertinent part, state:

> The fact that a corporation is a party must not influence you in your deliberations or in your verdict. Corporations and persons are equal in the eyes of the law. Both are entitled to the same fair and impartial treatment and to justice by the same legal standards.
>
> There are some legal terms that are referred to as "principal" and "agent." A principal can be held responsible for acts or omissions of the principal's agents; that is, a corporation can be held responsible for their employees. Employees are the agents of the company they work for.
>
> A person who is authorized to act for another person or in place of another person is an agent of that person. A person may be an agent whether or not payment is received for services. For purposes of this case the term "agent" includes an employee. The person who

-14-

authorizes the agent to act is called a principal. For purposes of this case the term "principal" includes an employer.

The defendants are sued as both principal and agent. It's been established that the defendant UT Medical Group is the principal and the doctors are the agents; therefore, the principal and agent should be considered as one in assigning fault.

If you find an agent is at fault, you've found the principal to be at fault. However, if you find the agent is not at fault, then [you have] found the principal is not at fault. (Emphasis supplied).

There is no issue of fact as to *respondeat superior*. A written copy of the full jury instructions was submitted to the jury prior to their deliberations. The jury verdict form, coupled with the jury instructions prepared by the trial court, made it clear to members of the jury that should any of the three physicians listed on the verdict form be found negligent, that UTMG would also be found negligent. Although the verdict form should not have included those individuals not alleged at fault, their inclusion is, at most, harmless error.[5]

> 5. Whether it was reversible error for the trial court to instruct the jury on T.P.I. 6.11, Duty of Specialist, when the [Appellee] was not a specialist of any kind at the time of the alleged negligent acts?

The Plaintiff argues that the trial court's use of T.P.I. 6.11 confused the jury as to the standard of care that Dr. Craig was to be held to and resulted in reversible error on the part of the trial court. T.P.I. 3 - Civil 6.11, Duty of Specialist reads:

> The skill, knowledge and care required of a physician who practices a particular specialty is the same as that of other reputable physicians who specialize in the same field and practice in the same or a similar community and under similar circumstances.

The standard for an appellate court's review of a trial judge's jury charge was stated in *City of Johnson City v. Outdoor West, Inc.,* 947 S.W.2d 855 (Tenn. Ct. App. 1996):

> We review the jury charge in its entirety to determine whether the trial judge committed reversible error. *Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 446 (Tenn.1992); *In re Estate of Elam,*

---

[5] We have not been able to find in the record any allegation on the part of the defendants that fault should be apportioned to the two resident physicians, Rockstroh and Kelly. The plaintiff's complaint against those two individuals was nonsuited. However, the trial court instructed the jury specifically that the "doctors" are agents and that if the agent is at fault, the principal, UTMG, is at fault. Under these circumstances, any error would be harmless and, in fact, the error would work in favor of the plaintiff.

-15-

738 S.W.2d 169, 174 (Tenn. 1987); and *Grissom v. Metropolitan Gov't of Nashville,* 817 S.W.2d 679, 685 (Tenn. Ct. App. 1991). The charge will not be invalidated if it "fairly defines the legal issues involved in the case and does not mislead the jury." *Otis,* 850 S.W.2d at 446; *Grissom,* 817 S.W.2d at 685. Furthermore, a particular instruction must be considered in the context of the entire charge. *Elam,* 738 S.W.2d at 174.

*City of Johnson City v. Outdoor West, Inc.* 947 S.W.2d 855, 858 (Tenn. Ct. App.1996). We assume from the Plaintiff's argument, although she did not specifically state it, that it would be the Plaintiff's preference that the trial court use T.P.I. 6.10, Duty of Physician. However, T.P.I. 6.11, Duty of Specialist, is a higher standard than that required under T.P.I. 6.10 for a general practitioner. If there was any error on the part of the trial court, it was in holding the defendant doctors to a higher standard than that of a general practitioner, which the Plaintiff claims they were at the time the alleged negligence occurred. Thus, even if the judge's use of the challenged jury instruction was in error, in the context of the entire jury charge, it has to be considered harmless.

> 6. Whether the testimony of Appellees' expert, Dr. Birkenstock, properly rebutted or refuted the Appellant's experts, Dr. Johnson and Dr. Shull and whether Appellees' expert presented credible evidence on the standard of care in this case.

Whether the Defendants' expert rebutted the Plaintiff's experts was a question for the jury to decide. The jury in this case listened to Dr. Birkenstock's testimony and considered his credentials, qualification and experience, and their verdict indicates that they accepted his credentials and testimony. In a jury trial, if there is any material evidence to support the verdict, the judgment must be affirmed. Tenn.R.App.P. 13(d); *Barnes v. Goodyear Tire and Rubber Co.,* 48 S.W.3d 698, 704 (Tenn. 2000). When addressing whether there is material evidence to support a verdict, an appellate court shall: (1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence. *Crabtree Masonry Co. v. C & R Constr., Inc.,* 575 S.W.2d 4, 5 (Tenn. 1978); *Black v. Quinn,* 646 S.W.2d 437, 439-40 (Tenn. Ct. App.1982). Appellate courts shall neither reweigh the evidence nor evaluate the credibility of witnesses. *White v. Vanderbilt University*, 21 S.W.3d 315 (Tenn. Ct. App. 1999). If the record contains "any material evidence to support the verdict, [the jury's findings] must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury." *Crabtree Masonry Co.,* 575 S.W.2d at 5. In this case the jury has resolved the question of credibility in the Defendants favor. Taking all of the rules into consideration, there is substantial material evidence to support the verdict of the jury.

For the foregoing reasons, we affirm the judgment of the trial court and remand for such further proceedings as may be necessary. Costs of the appeal are assessed to the Appellants, Jacob Shores, Eric Nelson, Leif Nelson, and Misty Nelson, and their surety.

 

_____
_____  **W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.**